POORMAN, Administratrix, Plaintiff, v. STATE BOARD OF EQUALIZATION et al., Defendants.

(No. 7,428.)

(Submitted April 12, 1935. Decided May 4, 1935.)

[45 Pac. (2d) 307.]

*Mr. Lew. L. Callaway,* for Plaintiff, submitted an original and a reply brief and argued the cause orally.

*Mr. W. Pigott* and *Mr. John J. Greene,* for Defendants, submitted a brief; *Mr. Pigott* argued the cause orally. *Mr. Raymond T. Nagle,* Attorney General, and *Mr. Jeremiah J. Lynch,* First Assistant Attorney General, of Counsel.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

On order to show cause, on the original application of Lulu J. Poorman, as administratrix of the estate of William H. Poorman, deceased, why the State Board of Equalization and the members thereof should not be permanently restrained and enjoined from collecting an income tax from the Poorman estate upon the salary paid to the deceased for a portion of the year 1934.

The Honorable William H. Poorman was elected as one of the judges of the first judicial district of the state of Montana at the general election in 1916, and was re-elected successively in 1920, 1924, 1928 and 1932; he died intestate on August 28, 1934. It is a grim commentary on the rewards of public service that, after almost eighteen years of honorable, faithful and distinguished service, and frugal habits, the judge left no considerable estate, and his sole income for 1934 was that portion of his salary earned up to the date of his death.

Judge Poorman's widow, Lulu J. Poorman, was duly appointed administratrix of his estate and qualified as such. In due time demand was made upon her that she make return of, and pay, the tax on such income in accordance with the provisions of Chapter 181 of the Laws of 1933. Being advised

that the Constitution of this state prohibits the diminution of a judge's salary during the term for which he was elected, and believing that such tax constituted a diminution of such salary, the administratrix accompanied her return with a protest, and, on being advised as to the amount of the tax computed on her return, formally refused to pay the same and commenced this action.

On behalf of the defendant board, the Attorney General demurred to the complaint filed, and thereafter the legal questions thereby presented were duly argued and submitted for our determination.

At the outset we may well adopt the prefatory remarks of the Supreme Court of the United States in a similar case (*Evans* v. *Gore,* 253 U. S. 245, 40 Sup. Ct. 550, 551, 64 L. Ed. 887, 11 A. L. R. 519): "Because of the individual relation of the members of this court to the question * * * stated, we cannot but regret that its solution falls to us; and this although each member has been paying the tax in respect of his salary voluntarily and in regular course. But jurisdiction of the present case cannot be declined or renounced." In the *Gore Case,* the court declared the question presented to be as to "the power to tax the compensation of federal judges in general," in the face of the constitutional prohibition that the compensation of such judges "shall not be diminished during their continuance in office."

The supreme court of North Carolina likewise declared that the question presented under a law similar to our own is: "Does a tax levied on plaintiff's official salary amount to a diminution thereof in derogation of the constitutional provision" identical with that of the federal Constitution? (*Long* v. *Watts,* 183 N. C. 99, 110 S. E. 765, 767, 22 A. L. R. 277.)

If we could agree that there is here presented the broad question of the right of the state to tax the salary paid by it to its judges, we could easily dispose of this case by overruling the demurrer to the complaint on the authority of the two cases cited above. A tax levied upon a salary, as such, and taken therefrom, clearly diminishes that salary to the extent

of the tax paid. Thus, in Pennsylvania an early legislature passed an Act providing that "there shall be annually levied upon salaries and emoluments of office, created or held by or under the Constitution, a tax of two per cent. upon every dollar thereof above $200; * * * when * * * paid * * * directly by the treasurer, he shall retain out of said salary the amount imposed by the Act." The Act was properly held to be unconstitutional in so far as judges were concerned, in view of the constitutional provision of Pennsylvania, identical with that of the Federal Constitution. (*Commonwealth* v. *Mann*, 5 Watts & S. (Pa.) 403.)

In Louisiana it was early held that a similar constitutional provision prohibited the city of New Orleans from taxing the salaries of the Justices of the supreme court, but the short opinion rendered does not indicate the nature of the taxing Act. (*City of New Orleans* v. *Lea*, 14 La. Ann. 197.)

In 1932 the House of Representatives of Alabama submitted to the Justices of the supreme court a proposed *act* "to require and levy an occupation, license or privilege tax on every person who is an official of the State of Alabama," and "to provide that the warrant, check or voucher for the payment of the salary of such official * * * shall be for the amount of the salary * * * less the said tax." The Justices very properly advised the House that constitutional provisions in that state forbidding the reduction of the salaries of judicial, and certain other state officers, prohibited such enactment as "plainly and palpably unconstitutional." (*In re Opinion of the Justices*, 225 Ala. 502, 144 So. 111, 112.)

The foregoing are all the cases which the industry of the learned counsel for plaintiff has enabled him to present in support of his position, except that of *Miles* v. *Graham*, 268 U. S. 501, 45 Sup. Ct. 601, 69 L. Ed. 1067, which is merely a further pronouncement of the Supreme Court of the United States based on the *Gore Case*.

The *Miles Case* has been cited as authority for the position that the constitutional provision protects judges appointed after as well as before the enactment of the Income Tax Law.

There the district court so held on the theory that it was not for the court to say that Congress would have taxed few judges had it known that its efforts to tax all such would fail (284 Fed. 878), and the judgment was affirmed; the court pointing out that the salary of the plaintiff was specifically fixed by Congress after the enactment of the Income Tax Law, and saying that if the dates were reversed it would be impossible to construe the taxing Act as an amendment which would reduce the salary by the amount of the tax. It is clear that the holding was impelled by the inseparability of the two classes mentioned and by the peculiar facts controlling. Since the decision was promulgated, Congress, with knowledge thereof, has passed the 1928 Income Tax Law (Revenue Act, 26 U. S. C. A., sec. 2001 et seq.), and it is reasonably clear that the Supreme Court would not now extend the federal prohibition to include judges hereafter appointed.

The foregoing analysis of the cases relied upon by plaintiff demonstrates that the only courts holding that the collection of an ''income tax'' violates a constitutional prohibition against the diminution of official salaries during ''continuance in office'' are the Supreme Court of the United States, and the supreme court of North Carolina, and these two courts have only spoken respecting the judiciary as a protected class. The Federal Constitution contains a like provision exempting the salary of the President from diminution, and Mr. Justice Clark, in a concurring opinion in the North Carolina case, declares that their provision exempts only twenty-five judges and seven heads of the Executive Department, though the provision quoted in that decision applies only to the judiciary.

As will later appear, the situation in Montana, by virtue of our constitutional provisions which control, is vastly different.

In the *Gore Case* it is declared that the provision against diminution of salary is coupled with that as to tenure in office, federal judges being appointed ''during good behavior,'' or for life, as a method of ''attracting good and competent men to the bench and to promote that independence of action and judgment which is essential to the maintenance of the guar-

anties, limitations and prevailing principles of the Constitution and to the administration of justice without respect to persons and with equal concern for the poor and the rich." This conclusion was reached by reason of consideration of the declarations of such men as George Washington, Alexander Hamilton and Chancellor Kent, respecting the necessity of a judiciary independent of the control of the executive and legislative branches of the government—a necessity brought home to the minds of those great men by familiarity with the abuses recorded in history when the judges were at the mercy of unscrupulous monarchs, which history is more fully set forth in *Commonwealth* v. *Mann*, supra. There it is said that "experience has also taught us the useful lesson, that there is no more effectual way of destroying the liberties of the people, than by gradual encroachments under color of law, and that no better instrument could be employed for that purpose, than a venal, time-serving, timid and subservient judiciary." It is then said, and the same thought is contained in the Gore opinion, that the framers of the Constitution "conversant with the history of the past, and looking with prophetic eye to the future" framed the prohibition against diminution to protect the judiciary, "the weakest and most exposed to attack" of the three departments of government, from the encroachments of the others. The supreme court of North Carolina adopted the reasoning of the Gore opinion and declared that it could not give to their provision, identical with that of the Federal Constitution, a construction different from that declared by the Supreme Court of the United States.

The history chronicled in these opinions demonstrates the necessity of protecting the judiciary from the legislative department, so that its judgment may not be warped by the threat of financial embarrassment if the displeasure of the department controlling the purse strings is incurred. For the reasons controlling in these opinions, it is held that the emergency created by the depression cannot remove this safeguard as to judges holding offices created by the Constitution, but that the prohibition in this respect does not apply

to judges not so fortunately situated. (*Gresser* v. *O'Brien,* 146 Misc. 909, 263 N. Y. Supp. 68, affirmed 263 N. Y. 622, 189 N. E. 727.)

The framers of our Constitution not only safeguarded the judiciary against coercion or oppression by means of the diminution of salary, or the threats thereof, but went one step further and protected the people against the danger of the judiciary becoming subservient for the purpose of gain, by declaring that "the justices of the supreme court and the judges of the district courts shall each be paid quarterly by the state, a salary, which shall not be increased or diminished during the terms for which they shall have been respectively elected." (Sec. 29, Art. VIII, Mont. Const.) With this provision before us, we agree with the learned judges who wrote the foregoing opinions, holding that the legislature has no power or authority to decrease the salary of any judge mentioned therein, either directly by an amendment to the statute fixing the salary, or indirectly by a tax levied directly upon such salary, during the term for which such judge is elected.

The framers of our Constitution, however, were not content to stop with the prohibition against increasing the salaries of *judges* during their term of office, but, evidently of the opinion that laymen in high office, as well as members of the legal profession, might be tempted to depart from the straight path of rectitude and official duty in return for an increase in the emoluments of the office entrusted to them for a period, declared that the salary of no elected executive officer of the state "shall be increased during his term of office" (sec. 4, Art. VII), and that no member of either House of the Legislature shall, during the term for which he is elected, "receive any increase of salary or mileage under any law passed during such term" (sec. 8, Art. V). These three provisions put the three co-ordinate departments of our government on an equal footing in so far as an increase in compensation during the term of office is concerned, leaving only the judiciary protected from a diminution of salary.

If we had no further constitutional provision on this subject, we might be constrained, for the reasons stated therein, to follow the majority opinion in *Evans* v. *Gore,* above, or declare with the supreme court of North Carolina that the legislature did not intend to include the judiciary in imposing an income tax, for that we would then, perhaps, be justified in protecting this department from even the suspicion of oppression or coercion. However, we have the further constitutional prohibition that ''except as otherwise provided in this Constitution, no law shall extend the term of any public officer, or increase or diminish his salary or emolument after his election or appointment. * * * '' (Sec. 31, Art. V.) Here we have a direct restriction upon the otherwise plenary power of the legislative department in this regard, which is all-inclusive, and renders all other prohibitions in the Constitution contained mere surplusage, as there is nothing ''otherwise provided'' in the Constitution which is now effective.

We have already given a comprehensive definition of a ''public officer.'' (*State ex rel. Barney* v. *Hawkins,* 79 Mont. 506, 257 Pac. 411, 53 A. L. R. 583; *State ex rel. Nagle* v. *Page,* 98 Mont. 14, 37 Pac. (2d) 575.) It would be impossible to here enumerate the host of officials which would escape contributing to the general burdens of the state by the payment of income tax exaction, under the above-mentioned definition, were we to hold that our all-inclusive prohibitions amounts to such an exemption. Suffice it to say that the definition is sufficient to include all individuals who hold public office either by election or appointment, for a definite period, great or small, and whether such office be state, county or municipal. (*State Consol. Pub. Co.* v. *Hill,* 39 Ariz. 21, 3 Pac. (2d) 525, and Id., 39 Ariz. 163, 4 Pac. (2d) 668; *State* v. *Wardall,* 107 Wash. 606, 183 Pac. 67; *Turner* v. *Ramsey,* 63 Okl. 199, 163 Pac. 712; *Calvert County Commrs.* v. *Monnett,* 164 Md. 101, 164 Atl. 155, 86 A. L. R. 1258; and see *Broadwater* v. *Kendig,* 80 Mont. 515, 261 Pac. 264.

The term "public officer" has been held to include deputy county officers, as well as their superiors (*Donges* v. *Beall*, (Tex. Civ. App.) 41 S. W. (2d) 531); an agency substituted for a county treasurer (*Bank of Chatsworth* v. *Hagedorn Const. Co.*, 156 Ga. 348, 119 S. E. 28); a city attorney (*State Consol. Pub. Co.* v. *Hill*, supra); notaries public (*Harris* v. *Watson*, 201 N. C. 661, 161 S. E. 215, 79 A. L. R. 441); policemen (*State* v. *Saillard*, 22 Wash. 267, 60 Pac. 651); a sheriff's "keeper" (*Duroch* v. *Caillouet*, 6 La. App. 222); and even a detective appointed by the public prosecutor (*Kidd* v. *Grier*, 10 N. J. Misc. 866, 161 Atl. 49). Were we, then, to hold that not only judges but every "public officer" is exempt, it is difficult to see how the Tax Department could determine the exemptions or avoid a multiplicity of suits.

However, we have indulged in this discussion, not for the purpose of rejecting the pronouncements of the *Gore Case*, followed in the *Miles Case* and in *Long* v. *Watts*, supra, on the ground that a like holding would render the enforcement of the provisions of our Income Tax Act well-nigh impossible, but for the purpose of demonstrating that the reasons for those decisions, perhaps cogent under the fact conditions there disclosed, have no place in the consideration of a claimed exemption in favor of a judge under our constitutional prohibition. A further reason why the Gore decision lacks persuasive strength here is, as noted above, that the court was dealing with judges who serve for life, while here we are dealing with a swarm of elective and appointive officers, no one of whom can hold office for a term of more than six years. There can be no suggestion of the use of the law-making power to reward friends or punish enemies in the enactment of a law which must apply with equal vigor to all such officials—executive, legislative and judicial throughout all the ramifications of government. Even under the federal prohibition, Mr. Justice Holmes, in his dissenting opinion in the *Gore Case* (concurred in by Mr. Justice Brandeis) declared: "To require a man to pay the taxes that all other men have to pay cannot

possibly be made an instrument to attack his independence as a judge."

With reference to the constitutional provision under consideration, this court, after commenting upon the reasons given in the *Gore Case,* said: "So far as there is reason for the rule which underlies the limitations, it must be enforced with the utmost vigor, but whenever the reason for the rule ceases, so does the rule itself." (*State ex rel. Jackson* v. *Porter,* 57 Mont. 343, 188 Pac. 375, 376.) In the *Jackson Case,* the salaries of district judges were raised after a general election of judges, but, a judge having resigned, Jackson was appointed to serve until the next general election; the reason for the rule against permitting a judge to receive an increase in salary "during the term" having failed, the rule was not applied; Jackson was permitted to receive the increased salary. (See, also, *Broadwater* v. *Kendig,* supra.)

What would be the decision, and the reasons therefor, by the Supreme Court of the United States, with reference to the Income Tax Law, if the Constitution of the United States prohibited the diminution of the salary of any federal officer during the term for which he was elected or appointed, we cannot, of course, say; but certain it is that a decision in favor of an officer in such a case could not be grounded on the reasons given in the *Gore Case.*

Getting away, then, from the outlived fear that the monarch, metamorphosed into a legislative body, will seek to control courts by the manipulation of salaries, we are called upon to determine the question, not whether the legislature may *tax* the salary of a public officer, which is the nature of the question propounded by the court in the *Gore Case* and in the case of *Long* v. *Watts,* supra, and which we agree cannot be done, but whether the imposition of a "net" income tax on "every individual" (Chap. 181, Laws of 1933), must be held not applicable to those individuals holding public office, because of the constitutional prohibition against diminution of the salaries of public officers during the terms for which they are elected or appointed.

"Salaries" of public officers (except salary of officials and employees of the United States which is specifically exempted from inclusion in "gross income" by subdivision (2) (f) of section 7 of the Act) are not mentioned in Chapter 181, above, either for inclusion or exclusion. Section 7 declares that the term "gross income" (1) "includes gains, profits and income derived from salaries, wages or compensation for personal service, of whatever kind and in whatever form paid," thus swooping into one great dragnet all "individuals" in the state, great or small, rich or poor, so long as any one of any class can show an "income" for the year preceding in excess of the minimum amount fixed.

The Legislative Assembly of 1933, in addition to enacting what is now Chapter 181, Laws of 1933, out of an abundance of caution provided for the submission to the people of a constitutional amendment, to permit the legislature to "levy and collect taxes upon incomes." (See Chap. 83, Laws of 1933.) This amendment carried at the general election of 1934, so that we now have, within the Constitution, special authority to the legislature to tax all persons on their incomes "for the purpose of replacing property taxes." If the income tax does replace property taxes to the extent of the amount received by the state and its subdivisions, it is hard to see how the imposition of such a tax on the officials diminishes their salaries, under any conceivable theory, as all who own property must pay the property tax, regardless of whether or not they hold public office. What effect the amendment might have on the prohibition under consideration we need not consider, for, before the amendment was submitted to the people, this court declared the Income Tax Act valid under the Constitution, as it then existed. (*O'Connell* v. *State Board of Equalization*, 95 Mont. 91, 25 Pac. (2d) 114.) In reaching this conclusion we pointed out the difference between Constitution of the United States and that of Montana, the first being the grant of power, the second a limitation upon the otherwise plenary powers of the legislature, so that the applicable limitation must be clear in order to deny to the legislature au-

thority to enact any given legislation, and declared that no Act of our legislature can be declared unconstitutional unless its invalidity is made manifest beyond a reasonable doubt.

What, then, is the nature of an income tax and what relation to the salary of an official does such tax on his net income bear? "An income tax is distinguished from other forms of taxation in this respect: that it is not levied upon property, nor upon the operations of trade or business or the subjects employed therein, nor upon the practice of a profession or the pursuit of a trade or calling, but upon the acquisitions of the taxpayer arising from one or more of these sources, or all combined, annually or at other stated intervals, and generally, but not necessarily, upon only the excess of such acquisitions over a certain minimum sum." (Black on Income and Other Federal Taxes, 4th ed., 1.)

A person in carrying on a certain business may be subjected to a license tax for the privilege of pursuing his avocation, to state, county and municipal taxes on his stock in trade, and to a tax on the income which he derives from his business, and yet, while the payment of all of these taxes must come from the same fund, they relate to different subjects and do not overlap or conflict, and their imposition forms no legal ground for complaint. (Black, above, p. 41; *Commonwealth* v. *Brown,* 91 Va. 762, 21 S. E. 357, 28 L. R. A. 110.)

Section 31 of Chapter 181, above, declares that "the net income required to be shown on returns under this Act and taken as the basis for determining the tax hereunder shall not be classified or held or construed to be property." In the *O'Connell Case,* supra, we pointed out the difficulty text-writers and courts have experienced in attempting accurately to classify the income tax and the diversity of opinion as to its nature, and then contented ourselves with saying that it is not a property tax. The failure to so classify the tax may account for the conclusion that it is a tax on salary.

The supreme court of Missouri likewise held that this tax is not a "property tax" but merely "a tax on income" (*Ludlow-Saylor Wire Co.* v. *Wollbrinck,* 275 Mo. 339, 205

S. W. 196), a fact to be recalled later on consideration of that court's disposition of the question here presented. It is "an assessment upon the income of the person and not upon any particular property from which that income is derived" (*Young* v. *Illinois Athletic Club,* 310 Ill. 75, 141 N. E. 369, 371, 30 A. L. R. 985) ; "a tax on the person measured by his ability to pay" (*Tax Commissioner* v. *Putnam,* 227 Mass. 522, 116 N. E. 904, L. R. A. 1917F, 806).

The federal income tax was first held to be an indirect tax (*Springer* v. *United States,* 102 U. S. 586, 26 L. Ed. 253), a manifest erroneous holding later overruled. (*Pollock* v. *Farmers' Loan & Trust Co.,* 157 U. S. 429, 15 Sup. Ct. 673, 39 L. Ed. 759, also Id., 158 U. S. 601, 15 Sup. Ct. 912, 39 L. Ed. 1108.) It is a direct tax, in that the individual paying it must bear the expense of it without recoupment rather than indemnifying himself at the expense of others.

This "tax on income," then, is not levied upon property at all, but upon "the acquisitions" of the taxpayer, regardless of the source, and, although "salaries" figure in the computation of "gross income," that the tax in certain instances reaches salaries is but incidental—an individual's salary is not even used as a yardstick for the measurement of such a tax.

The constitutional prohibition against diminution of salaries cannot be evaded by any device conceived, however skilfully camouflaged, to take away from, or withhold from, an officer a part of the salary to which he is entitled during the term for which he was elected or appointed; but it is idle to say that because of this prohibition an official can refuse to pay any species of tax whatever from his acquisitions by way of salary. If an official, for example, has no income other than his salary, as was the case of Judge Poorman, but by frugality reaches a point where he has no immediate need for the amount he receives at the end of the last quarter of the year, and has that amount, or a substantial part thereof, in bank on the first Monday in March, he could not prevent the county assessor from including it in his assessment for the year, or if he early in the year used his quarterly salary as a down payment on

a house, would his house be exempt from taxation because the whole interest he had therein was acquired from salary?

Every time such an official has the tank of his car filled with gasoline, he pays a state and a federal tax from his salary, and every time he purchases a package of cigarettes or attends a moving picture show, paying in excess of fifty cents for the privilege, he pays a federal tax from his salary, and would certainly lose an argument with the merchant or the proprietor of the show house to the effect that the tax could not be collected from him, although it is clear that the federal government cannot tax the *salary* of a state officer because of the mutual relation of the one to the other, neither being authorized to tax the means or agencies employed by the other in carrying on its governmental functions. (*Collector* v. *Day*, 11 Wall. 113, 20 L. Ed. 122; *Van Brocklin* v. *Tennessee*, 117 U. S. 151, 6 Sup. Ct. 670, 29 L. Ed. 845; *Gillespie* v. *Oklahoma*, 257 U. S. 501, 42 Sup. Ct. 171, 66 L. Ed. 338; *King* v. *Hunter*, 65 N. C. 603, 6 Am. Rep. 754). The classic decision on the subject of intergovernmental relations of the state and nation for tax purposes is *McCulloch* v. *Maryland*, 4 Wheat. 316, 4 L. Ed. 579.

However, even this prohibition does not extend to the profits derived from the operation of state instrumentalities by individuals; thus, when a state leases school lands for oil operations and requires the lessee to pay one-eighth· of the value of oil produced as rental, the profits derived from the operation, after paying the state's royalty, are not immune from the federal income tax on the ground that the leases are state instrumentalities, the court saying: ''Property which has thus passed from either the national or a state government to private ownership becomes a part of the common mass of property and subject to its common burdens.'' (*Group No. 1 Oil Corp.* v. *Bass,* 283 U. S. 279, 51 Sup. Ct. 432, 433, 75 L. Ed. 1032.)

A fine distinction has been drawn by the Supreme Court of the United States with reference to the interest on tax-exempt municipal bonds. It was first held that such interest was exempt because such a tax is a tax on the power of the states and their instrumentalities to borrow money. (*Pollock* v.

*Farmers' Loan & Trust Co.,* 157 U. S. 429, 15 Sup. Ct. 673, 39 L. Ed. 759.) A similar question arose under the corporation excise tax law of 1909, and it was then held that, although the income of a corporation might consist entirely of interest on municipal bonds, the corporation was liable because this tax was not levied upon the *income* but on the franchise or privilege of doing business, the income being merely used as a measure of the amount of the tax. (*Flint* v. *Stone-Tracy Co.,* 220 U. S. 107, 31 Sup. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312.) The amount payable would come from the same source in each instance, and if the one was barred by the constitutional prohibition against taxing states' instrumentalities, it would seem that the other should also, or conversely, that if the source of income is not to be considered in passing on a privilege tax, it should not be in passing on a direct income tax.

Manifestly, the salary of an official cannot be reduced during his term of office by an amendment to the salary-fixing statute, and it is equally true that a direct tax levied against such salary, as in the cases heretofore commented upon from Pennsylvania, Alabama and Louisiana, in effect constitutes such an amendment; it affects all officials drawing salary in like manner. But, as declared in the *Miles Case,* it is impossible to construe a "net" income tax law as an amendment which reduces salaries by the amount of the tax; this for the reason that the tax is not levied against the salary and does not affect all officials alike; of two officials whose salary is the same, by reason of the allowable exemptions and deductions from the "gross income" in order to arrive at the taxable income, one may be required to pay a substantial tax, and the other no tax whatever, although neither has an income outside of his salary. The "net" result of the computation is but "the profit derived from the operation" of a governmental instrumentality—the office—by an individual.

Again reverting to the dissenting opinion of Mr. Justice Holmes in the *Gore Case,* we agree with the declaration of that distinguished jurist, particularly when, as here, we have the

558

broad question of the exemption of the entire host of public officials within the state, rather than the narrow question presented to the Supreme Court of the United States of the exemption of judges, when he said: "I see nothing in the purpose of this clause of the Constitution to indicate that the judges were to be a privileged class, free from bearing their share of the cost of the institutions upon which their well-being if not their life depends. I see equally little in the letter of the clause to indicate the intent supposed. The tax on net incomes is a tax on the balance of a mutual account in which there always are some and may be many items on both sides. It seems to me that it cannot be affected by an inquiry into the source from which the items more or less remotely are derived. * * * I see no greater reason for exempting the recipients while they still have income as income than when they have invested it in a house or bond."

The writer of this opinion would not presume to attempt to improve upon Justice Holmes' demonstration that the majority opinion in the *Gore Case* is not in harmony with former pronouncements of that court, when he said: "The decisions heretofore reached by this Court seem to me to justify my conclusion. In *Peck & Co.* v. *Lowe,* 247 U. S. 165, 38 Sup. Ct. 432, 62 L. Ed. 1049, a tax was levied by Congress upon the income of the plaintiff corporation. More than two-thirds of the income were derived from exports and the Constitution in terms prohibits any tax on articles exported from any state. By construction it had been held to create 'a freedom from any tax which directly burdens the exportation.' (*Fairbank* v. *United States,* 181 U. S. 283, 293, 21 Sup. Ct. 648, 652, 45 L. Ed. 862.) The prohibition was unequivocal and express, not merely an inference as in the present case. Yet it was held unanimously that the tax was valid. 'It is not laid on income from exportation * * * in a discriminative way, but just as it is laid on other income. * * * There is no discrimination. At most, exportation is affected only indirectly and remotely. The tax is levied * * * after the recipient of the income is free to use it as he chooses. Thus what is

taxed—the net income—is as far removed from exportation as are articles intended for export before the exportation begins.' (247 U. S. 174, 175, 38 Sup. Ct. 432, 434, 62 L. Ed. 1049.) All this applies even with greater force when, as I have observed, the Constitution has no words that forbid a tax. In *United States Glue Co. v. Oak Creek*, 247 U. S. 321, 329, 38 Sup. Ct. 499, 62 L. Ed. 1135, Ann. Cas. 1918E, 748, the same principle was affirmed as to interstate commerce and it was said that if there was no discrimination against such commerce the tax constituted one of the ordinary burdens of government from which parties were not exempted because they happened to be engaged in commerce among the states.''

A somewhat analogous question has been presented in this state with respect to the taxation of bank stock where a substantial part of the bank's assets is invested in nontaxable securities. We first held that property of a state bank represented by bonds of the United States is exempt from taxation under the supreme law of the land. (*East Helena State Bank v. Rogers*, 73 Mont. 210, 236 Pac. 1090.) We later held that, to the extent that shares of stock in a state bank have a value over and above the value of the bank's taxable property, they are taxable without reference to the character of the securities which go to make up that value. (*Montana Nat. Bank v. Yellowstone County*, 78 Mont. 62, 252 Pac. 876.) This latter case went to the Supreme Court of the United States, where it was declared that ''in respect of the taxation of state corporate banks, the shares must be taxed as they are in the case of national banks, so far as necessary to prevent discrimination, and that, in neither case, does the exemption of federal securities apply in the taxation of such shares.'' (*Montana Nat. Bank v. Yellowstone County*, 276 U. S. 499, 48 Sup. Ct. 331, 333, 72 L. Ed. 673.) This although the court found that the ''shares had a very large taxable value over and above the value of the taxable property of the banks, due to the ownership by the banks of tax-exempt federal securities.'' Thus, while the securities were not taxable either directly or indirectly, their value entered into the computation of the ''gross'' for the pur-

pose of determining the "net" value of the shares of stock, just as a salary enters into the computation of "gross income" for the purpose of determining the "net" income to be taxed. (See, also, *Bank of Miles City* v. *Custer County*, 93 Mont. 291, 19 Pac. (2d) 885.)

The taxation of the bank shares is not a tax on the securities, and no more is a net income tax against the recipients of nontaxable salaries a tax, either direct or indirect, on such salaries; the net income by way of salary has come into the hands of the recipients to do with as they choose; it has lost its identity as salary and the tax is a direct tax against the individuals—not against the salary as property—and constitutes one of the ordinary burdens of government from which none of us should be exempted merely because we happen to be "public officers," while we look to that government for the protection of lives and liberties, and the enjoyment of the property which we may purchase with the income derived from our salaries.

"An exemption from taxation is a release from the obligation to support the government which affords protection to the taxpayer, and he who seeks immunity has the burden of showing that the property claimed to be exempt belongs to a class which is specifically exempt." (*Cruse* v. *Fischl*, 55 Mont. 258, 175 Pac. 878.) Here we have no specific exemption and if we would exempt "public officers" from the payment of the income tax we must find reasons, other than those given in the case on which the plaintiff relies, for torturing the prohibition against diminution of salaries into an implied exemption from the payment of income taxes.

Again the Supreme Court of the United States has made a pronouncement which we think applicable here. "The difference in effect between a tax measured by gross receipts and one measured by net income, recognized by our decisions, is manifest and substantial, and it affords a convenient and workable basis of distinction between a direct and immediate burden upon the business affected and a charge that is only indirect and incidental." (*United States Glue Co.* v. *Oak Creek,*

above.) Here, Judge Poorman's "gross receipts" for the year 1934 are shown to be $3,200, all, it is true, received as salary, but his "net" income on which his administratrix is called upon to pay a tax was found to be but $875.

There seem to have been a remarkably few cases on the question here presented, in addition to the North Carolina case, following the rule laid down in the *Gore Case;* the only states apparently, which have passed on the question are Wisconsin and Missouri.

Prior to the Pennsylvania case, cited above, the supreme court of that state had up the question of the exemption of a judge from the payment of a tax which the court treated as in the nature of an income tax, under the constitutional prohibition against the diminution of such salary. The court there said that, under the Constitution, the legislature "is undoubtedly incompetent to reduce the defendant's salary. But as the Constitution, like every other instrument, is to have a reasonable interpretation, the prohibition in question is to be restrained to laws which have such a reduction for their object and not for their consequence. On any other principle of construction a tax could not be constitutionally assessed on property purchased with money drawn from a judge's salary, which would, in reason, have as fair a claim to exemption as the salary itself. If we once get away from the plain inartificial import of the prohibition, it is not easy to foretell at what stage of refinement we shall stop." (*Commissioners of Northumberland County* v. *Chapman,* 2 Rawle (Pa.), 73.) While this opinion may not be sound on the facts before the court, it is sound in principle when applied to a net income tax.

In Wisconsin it was held, before the Gore decision, that the imposition of a net income tax did not violate a constitutional prohibition, like our own, declaring that the compensation of any public officer shall not be increased or diminished during his term of office. (*State ex rel. Wickham* v. *Nygaard,* 159 Wis. 396, 150 N. W. 513, 516, Ann. Cas. 1917A, 1065.) In Wisconsin, as here, the Constitution had been amended to permit the taxing of all incomes; so the case is on all-fours with

this one. The court declared that, due to the broad and sweeping nature of both the constitutional prohibition and the taxing provisions, the salary of a judge was subject to the tax, saying: "We are not at liberty to rewrite this clause [that taxes may be imposed on incomes], so as to read that taxes may be 'imposed on incomes, except where the income consists of a salary received by a public officer.' "

The last pronouncement on the subject is found in *Taylor* v. *Gehner*, 329 Mo. 511, 45 S. W. (2d) 59, 60, 82 A. L. R. 986, wherein a judge relied upon the *Gore Case* for exemption, but the court refused to follow the majority opinion, and declared in favor of the sound reasoning of Justice Holmes, holding that the constitutional provision against the diminution of salary is not a tax exemption provision but merely "one of the checks and restraints imposed to secure the independence of the judiciary."

From the foregoing it will be noted that there is no clear weight of authority the one way or the other. Of the decisions directly in point, we have, on the one hand, *Evans* v. *Gore* and *Long* v. *Watts,* construing constitutional prohibitions dissimilar to ours; on the other hand, *State ex rel. Wickham* v. *Nygaard* and *Taylor* v. *Gehner,* construing provisions identical with, or at least similar to our own. Evans was a United States district judge; his petition was heard by his brother jurist, Judge Peck, of the southern district of Ohio, whose interest in the outcome of the case was identical with that of Judge Evans, but who decided against the immunity of the judges. Judge Peck reviewed the two Pennsylvania cases cited above, and declared: "There is nothing irreconcilable in these two decisions. The one, condemning a special tax on salaries, admits the propriety of a general tax on incomes, including the judicial salary; the other upholds the latter form of taxation. The distinction between these two cases would seem to define clearly the boundary line between diminution of salary by special taxation and the taxing of incomes generally, including such salaries." (*Evans* v. *Gore,* (D. C.) 262 Fed. 550, 554.) To our minds this is a clear and logical statement

of the distinction between the two classes of cases mentioned herein. It is true that the Supreme Court of the United States overruled this decision, but it is to be noted that two members of that court were in disagreement, and, as noted above, the constitutional provision construed applied only to the salaries of judges and was interpreted in the light of the history of the oppression of the judiciary for improper ends, while our prohibition is so broad and all-inclusive as to bring all public officers, of every department and rank, within the immunity, were we to follow the majority opinion; we have, after careful consideration, decided to follow rather the dissenting opinion and the opinions of the Wisconsin and Missouri courts. This, we think, logic, reason and justice demand.

Inasmuch as our Constitution has set at rest all fear that our courts may be coerced by other departments of government, in the manner suggested, and, consequently, the reason for the rule of rigid enforcement of the "checks and restraints" provided for therein fails, the rule itself should not be applied in the instant case, and, as the Act under consideration does not have for its purpose, either directly or indirectly, the diminution of the salary of any public officer, but merely seeks to impose upon each individual, whatever his vocation, calling or business, his just proportion of the cost of maintaining the state government, we are constrained to sustain the demurrer to the complaint, and dismiss the proceeding. It is so ordered.

ASSOCIATE JUSTICES STEWART, ANDERSON and MORRIS concur.

MR. CHIEF JUSTICE SANDS, being absent on account of illness, did not hear the argument and takes no part in the foregoing decision.