WILLIAM S. GORDY, JR., COMPTROLLER, *v.* SAMUEL K. DENNIS.

[No. 87, October Term, 1938.]

*Decided May 29th, 1939.*

The cause was reargued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*William C. Walsh, Attorney General,* and *William L. Henderson, Deputy Attorney General,* for the appellant.

*William L. Rawls* and *Julian de Bruyn Kops, Jr.,* with whom were *Marbury, Gosnell & Williams* on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

After the six members of the court, who were entitled after the first argument to express an opinion, had equally divided on the principal question presented on this appeal, a reargument was ordered on the application of the Attorney General of the State. All the judges sat on the reargument, and a majority of the court were of the opinion that the judgment of the *nisi prius* court should be affirmed. Because of the importance of a prompt decision, a *per curiam* order of affirmance was filed, to be followed by an opinion of the court, and the dissent of the minority.

The first question is whether the appeal could be entertained, since the problem raised involved the exemption from taxation of the salary of every judge of all the courts of the State. The circumstance that the cause here relates to the salary of the Chief Judge of the Supreme Court of Baltimore City, and not to that of any member of the appellate court, left every one of the judges of the latter court with a common, although indirect, interest in the result.

The only constitutional disqualification specifically imposed upon a member of the appellate bench is that he may not participate in the decision of any cause which he heard below. Constitution, art. 4, sec. 15. In addition to this particular provision, there is another constitutional one of general application that: "No Judge shall sit in any case wherein he may be interested or where

either of the parties may be connected with him by affinity or consanguinity within such degrees as now are or may hereafter be prescribed by Law, or where he shall have been of counsel in the case." Article 4, section 7. The statutory law has defined this degree of relationship, for the disqualification of every judge of the Court of Appeals, or any judge of a circuit court or the Supreme Bench of Baltimore City, to be a connection by consanguinity or affinity with any party to a cause within the third degree as then defined. Code, art. 26, sec. 31. Furthermore, the former authorization of the appointment of a special judge in the event of a disqualification of a judge of the circuit courts or of the courts of Baltimore City was omitted after the Constitution of 1864 was superseded by that of 1867. Constitution of 1851, art. 4, sec. 22; Constitution of 1864, art. 4, sec. 8; *Niles on Constitutional Law*, pp. 418, 451, 452.

It is apparent that these constitutional and statutory provisions do not contemplate the unusual conditions of this appeal, where every judge is collaterally affected by the judgment to be rendered on the incidence of a tax upon income.

Under these circumstances the disqualification of all the judges would destroy the only tribunal in which relief by appeal may be sought. To bar the opportunity for redress by appeal is more prejudicial to sound public policy than the alternative, to permit an appeal to be heard by judges whose disqualification is in their collateral interest in the legal effect of the judgment to be rendered. So, of necessity, the rule as to the disqualification of judges must yield if the right of appeal is to be preserved. "The settled rule of law is that, although a judge had better not, if it can be avoided, take part in the decision of a case in which he has any personal interest, yet he not only may but he must do so if the case cannot be heard otherwise." *Pollock, First Book of Jurisprudence*, 235; 1 *Freeman on Judgments* (5th Ed.), sec. 330; and reviews of cases in 39 *A. L. R.* 1476; *L. R. A.* 1915 E, 858; *Ann. Cas.* 1917 A, 1061. There being neither

constitutional nor statutory mandate to the contrary, on the facts of this record, the court is of the opinion that the appeal must be entertained. *In re Duncan, Duncan v. McCall,* 139 U. S. 449, 455, 11 S. Ct. 573, 35 L. Ed. 219; *Comm. v. McLane,* 4 Gray (Mass.) 427; *Hill v. Wells,* 6 Pick. (Mass.) 104; *Pearce v. Atwood,* 13 Mass. 324; *Comm. v. Ryan,* 5 Mass. 90; *Bliss v. Caille Bros. Co.,* 149 Mich. 601, 113 N. W. 317; *In re Ryers,* 72 N. Y. 1; *Philadelphia v. Fox,* 64 Pa. 169; *Galey v. Montgomery County,* 174 Ind. 181, 91 N. E. 593; *State v. Nygaard,* 159 Wis. 396, 401, 150 N. W. 513; *State v. Houser,* 122 Wis. 534, 100 N. W. 964; *Moses v. Julian.* 45 N. H. 52. See *County Commissioners for Charles County v. Wilmer,* 1917, 131 Md. 175, 176, 179-181, 101 A. 686; *Blackburn v. Craufurd,* 1864, 22 Md. 447, 455, 458-460; *Magruder v. Swann,* 1866, 25 Md. 173, 205, 206; *Buckingham v. Davis,* 1856, 9 Md. 324, 328-330; *Thellusson v. Rendlesham,* 7 H. L. Cas. 429, 11 Eng. Reprint, 172; *Grand Junction Canal Co. v. Dimes,* 12 Beav. 63, 10 Reprint, 984, 3 H. of L. Cas. 759, 10 Reprint, 301; *In re Great Charte Parish,* 2 Str. 1173, 93 Reprint 1107. Compare *London v. Markwick,* 11 Mod. 164, 88 Reprint 964; *Anon.* (1698), 1 Salk. 396, 91 Reprint, 1107; *Evans v. Gore,* 253 U. S. 245, 247, 40 S. Ct. 550, 64 L. Ed. 887. See *Ex parte Bowles,* 164 Md. 318, 325-327, 165 A. 169.

An issue of law between parties in reference to a constitutional right must have an appropriate tribunal for its adjudication.

The principal question is one of constitutional law. It is whether the salary which is received by the Chief Judge of the Supreme Bench of Baltimore City may be embraced in the income upon which a state income tax is laid pursuant to the terms of chapter 11 of the Acts of the General Assembly of Maryland passed at its Extraordinary Session held in 1937. While the judgment in the pending litigation affects directly the particular judge against whom the action is brought, the ruling of the appellate court will apply collaterally to the other members of the judiciary. So, in its broader aspect, the

question may be more simply stated to be whether the
salary paid a member of the judiciary can be lawfully in-
cluded in the income upon which a tax is imposed by
the State, notwithstanding the mandate of the Constitu-
tion of Maryland that "no fees, or perquisites, commis-
sion or reward of any kind, shall be allowed to any Judge
in this State, besides his annual salary, for the discharge
of any judicial duty"; and further that the salary "shall
not be diminished during his continuance in office." Con-
stitution 1867, art. 4, sec. 6, and secs. 24, 31.

The imperative inhibition of the present Constitution
(1867) that a judge's salary shall not be diminished dur-
ing his continuance in office was embodied in the State's
first Constitution of 1776, in article 30 of the Declaration
of Rights. The form there adopted was: "That salaries,
liberal, but not profuse, ought to be secured to the Chan-
cellor and the Judges, during the continuance of their
commissions, in such manner, and at such times, as the
Legislature shall hereafter direct, upon consideration of
the circumstances of this State." *Niles on Constitutional
Law,* p. 357. Some thirteen years later the Constitution
of the United States stated the rule more explicitly in sec-
tion 1 of article 3, by these words: "* * * The Judges,
both of the supreme and inferior Courts, shall hold their
Offices during good Behaviour, and shall, at stated Times,
receive for their Services, a Compensation, which shall
not be diminished during their Continuance in Office."
Since the people of the several original states established
the Constitution by ratification, this section of the Con-
stitution has not been changed.

The wording of the Constitution of 1776 was not al-
tered until chapter 55 of the Acts of 1804 proposed cer-
tain changes, which became, by ratification in 1805, a
part of the Constitution of Maryland. By this amend-
ment, the language of the Constitution of the United
States was closely followed, and the mandate read: "the
salaries of the said judges shall not be diminished during
the period of their continuance in office." *Niles on Con-
stitutional Law,* p. 377. In the Constitution of 1851

(*Niles on Constitutional Law,* pp. 413-415; Const. 1851, art. 4, sec. 4, sec. 9), as well as in the Constitution of 1864 (*Niles on Constitutional Law,* pp. 447, 455; Const. 1864, art. 3, sec. 34, art. 4, part 3, sec. 28), the increase as well as the diminution of the judicial salary was prohibited. There was no change in this wording until the Constitution of 1867, when the prohibition of an increase in salary was omitted, and only the diminution of salary denied. Const. 1867, art. 4, secs. 24-31. So that with the adoption of the first Constitution in Maryland in 1776 until the present day there has been a constant denial to the General Assembly of Maryland of the power to diminish the salary of a judge during his continuance in office. Since the Constitution of 1851 there has also subsisted the kindred provision that the salary or compensation of any public officer shall not be increased nor diminished during his term of office. *Niles on Constitutional Law,* p. 409; Const. 1851, art. 3, sec. 23, p. 447; Const. 1864, art. 3, sec. 34, p. 189; Const. 1867, art. 3, sec. 35; *Calvert County Commrs. v. Monnett,* 164 Md. 101, 164 A. 155.

Although there is abundant evidence that in every constitutional convention the amount of compensation to be paid for the services of the members of the judiciary has been the subject of controversy, the investigation of the court has not disclosed any question having been made as to the propriety of the denial of the power to diminish the amount of salary once that amount is decided. It is true that during the period (1851-1867) of the Constitutions of 1851 and 1864, there was the further prohibition of an increase of compensation, as has been uniformly provided since 1851 with respect to other public officers within the meaning of the constitutions. The difference in public policy which is reflected by these distinctions is attributable to the greater length of the judicial periods of service, which have either been for life and good behavior, or for a period of ten (1864-1867) or fifteen (1867-1939) years, so that there is a greater probability of a depreciation in value of the dollar aris-

ing during the lengthy judicial term than in the much shorter terms of office of other public officers. The argument ultimately prevailed that the General Assembly should have the reserved right to redress the loss in purchase power of the dollar by a compensatory increase of salary in the case of the judges, because of their complete dedication to the duties of an office which excluded the professional advancement of their private fortunes. Furthermore, the greater power and opportunity of public officers, who are within the executive and legislative branches, of the government, to increase, if unrestrained, their compensation while in office, afford a justification of the limitation in the public interest. See *The Chancellor's Case,* 1 Bland 595, 631-647, as to the effect on salaries of judges because of fluctuation and depreciation in value of the currency. *Documents Illustrative of the Formation of the Union* (1927), Govt. Printing Office, 403, 404, 623, 624; *The Making of the Constitution,* Warren, pp. 532, 533; *Two Centuries' Growth of American Law,* 1701-1901, p. 33; *Supreme Court of the United States,* Hughes, 14, 15.

One of the greatest evils to which the colonists were subjected was the effect of a dependent and subservient judiciary. In the arraignment of the King of Great Britain by the Declaration of Independence appears the charge that "He has made Judges dependent on his Will alone for the tenure of their offices, and the amount and payment of their salaries." Speaking towards the close of his eventful and great career, Chief Justice John Marshall declared that the greatest scourge to be inflicted upon a people "was an ignorant, a corrupt or a dependent Judiciary." *Niles on Constitutional Law,* p. 357. With a knowledge born of experience, the framers of the first Constitution of Maryland set forth in article 30 of the Declaration of Rights: "That the independency and uprightness of Judges are essential to the impartial administration of justice, and a great security to the rights and liberties of the people"; and the statement of this fundamental necessity is found expressed in every later

Constitution of the State. *Niles on Constitutional Law,*
p. 357 (1776), p. 399 (1851), p. 433 (1864), p. 52 (1867).
The importance of these qualities in the judges is greatly
increased by the distribution of the powers of the State
among her executive, legislative and judicial departments,
subject to the mandate that these legislative, executive
and judicial powers of government ought to be forever
separate and distinct from each other; and no person
exercising the function of one of said departments shall
assume or discharge the duties of any other. Constitution
of 1867, Declaration of Rights, article 8; *Niles on Consti-
tutional Law,* p. 357; *Beveridge's Life of Marshall,* vol. 4,
p. 495.

A similar limitation upon the Federal Government is
not declared in set words of the Constitution, but is im-
posed as a necessary inference from its provisions. *Kil-
bourn v. Thompson,* 103 U. S. 168, 190, 26 L. Ed. 377.
Thus it results that by both national and state constitu-
tions the independence of the members of the judiciary
is of paramount importance. The function of the judges
is to ascertain whether legislation has exceeded consti-
tutional bounds, and whether the acts of the executive
department are within the limits of its lawful power. If
the judge be subservient or dependent upon either the
legislative or executive branch of the government, the
central unity, balance, and harmony of the government
is destroyed. For the judge to be free and independent
neither his tenure of office nor his substistence may be
at the will of the executive or legislative branch. There-
fore the people of Maryland have assured to every judge
a definite term of office from which he cannot be removed
except for grave and specified causes, and by the pro-
cedure prescribed by the Constitution. Article 4, sections
3, 4, 5, 14, 19, 21, 27, Declaration of Rights, art. 33. It
is not enough for his independence that a judge be dis-
tinguished for integrity, wisdom, and legal knowledge
and have a certain, fixed term of office, from which he
may not be removed by arbitrary action, if he have not a
sufficient salary whose amount is beyond the power of

the executive or legislative branch of the government to impair. The certainty of a minimum compensation during his occupancy of office is, therefore, of the last importance, as it frees the judge of the undue influence of the General Assembly by a dependence upon that co-ordinate branch for a support.

The statutory, common, and constitutional laws of the State will fail to provide the remedies, secure the rights and enforce the liabilities of those within their operation, if they be not administered by an independent judiciary without fear or favor of the executive and legislative branches of the government. In the construction, therefore, of the mandate of the Constitution that the salary of a judge shall not be diminished during his continuance in office, the preservation of the independence of the judges ought to supersede all other considerations. As was said by Hamilton in *The Federalist*: "Next to permanency in office, nothing can contribute more to the independence of the judges than a fixed provision for their support. * * * In the general course of human nature, *a power over a man's subsistence amounts to a power over his will.* And we can never hope to see realized in practice the complete separation of the judicial system from the legislative power, in any system which leaves the former dependent for pecuniary resources on the occasional grants of the latter. * * *" The plan of the convention accordingly has provided that the judges of the United States "shall at *stated times* receive for their services a compensation which shall not be *diminished* during their continuance in office." No. 79 and No. 78. *Report of Joseph Story (1806) to Legislature of Massachusetts,* see Life and Letters of Joseph Story, vol. 1, pp. 130-136; 1 *Kent's Commentaries* (1826), pp. 292-295; *Laws and Jurisprudence of England and America,* Dillon, pp. 118, 120; 2 *Story on Constitution,* secs. 1628-1631; 1 *Carson's Supreme Court,* 6; *Works of James Wilson* (1896), vol. 1, p. 367; *Bancroft's History of the Constitution* (1882), vol. 2, pp. 29, 196, 197; *The American Commonwealth,* Bryce, vol. 1, p. 275; *Democracy in America,* De Tocqueville, vol. 1, p. 178.

Theodorick Bland, Chancellor of Maryland, was appointed on August 16th, 1824. When the General Assembly of Maryland met, at the December session, 1824, an angry excitement prevailed against him, and a controversy originated between the House of Delegates and the Senate with reference to his compensation. The House of Delegates asserted the right to reduce the salary of the Chancellor, either by direct enactment that would repeal all the laws which had made provision for its payment, or by a refusal to continue the usual appropriation. The Senate denied this right, on the ground that when the Chancellor came into office his salary was fixed by law and secured to him by the Declaration of Rights, so that, during his continuance of his commission, the Legislature had not the constitutional power to reduce that salary in any manner whatsover, during that period. As a result of this controversy, the session was adjourned without any appropriation, and the Chancellor was thereby totally deprived of all compensation after the close of the session. When the Legislature convened for the December session, 1825, the Chancellor addressed, on December 26th, 1825, a memorial to the General Assembly of Maryland because, independent of its bearing on his fate, which he regarded as of comparatively minor consideration, there were matters involved in the controversy "vitally affecting the constitution, and the safeguard of the people's rights of infinitely greater moment than the mere personal wrongs of the Chancellor." The memorial, with a short statement of the circumstances, is reported in full under the title "The Chancellor's Case" in 1 Bland, pp. 595-686. The constitutional question, in its historical setting, was presented with dignity, learning, completeness and force. Although not an adjudication, it has, through the strength and soundness of its exposition and the gravity of the problem at issue, the weight of an opinion and the importance of a state paper.

The position taken by the Chancellor was that the salary, when fixed, although it may be increased, cannot be

in any manner *diminished,* to the prejudice of the Chancellor, during the continuance of his commission. Again, in the course of the discussion, it is said:

"The salary of the chancellor is to be secured to him; that is, it shall not, at any time, on *purpose,* or by *neglect,* be withheld or diminished, during the continuance of his commission. This, the constitution has declared, shall not be *directly* and purposely done by the General Assembly; and surely, what is prohibited, and, therefore, cannot be directly done, can never be accomplished by any contrivance or indirect movement. * * * Commissions during good behaviour, and salaries secured during the continuance of those commissions, constitute that strong well marked boundary between the judiciary and the other two departments. Thus founded and sustained, the judges are, and can be—and without it they cannot be—a firm, efficient, co-ordinate check and balance in the government. It is this independency of character, that enables the judiciary to shield the citizen against unconstitutional legislation; and against unwarranted wrong and violence from the wealthy and the influential.

"But, it would be a mockery to expect of judges who are dependent upon legislators for their continuance in office, perhaps for their bread, a firmness and independency necessary for such purposes. No judge, thus dependent, would have the boldness to thwart a House of Delegates in their most ill-advised and wanton sports with the constitution." Pages 671, 672.

The effect of this address was immediate and decisive. The memorial was referred by the House of Delegates to a special committee, whose report was a full vindication of the Chancellor's position, and an adoption of the grounds upon which his address proceeded. See paper of William L. Marbury on: *"The High Court of Chancery and the Chancellors of Maryland,"* Proceedings of Maryland State Bar Association (1905), pp. 143-146. The General Assembly passed the necessary legislation to pay the Chancellor his back and future salary. Until the passage of the income tax, no further attempt is known to

have been made to diminish, *ad invitum,* the salary of a judge while in office. Diligent effort has not produced a decision by this appellate court upon the particular phase of the question on this appeal. A distinguished Maryland jurist did have occasion to protest an attempted diminution of his compensation as a federal judge under these circumstances.

Until 1862 no attempt, it is stated, had been made to tax the salaries of judges, but in that year the Congress of the United States passed an act imposing a tax of three per centum on the salaries of all officers in the employment of the United States. The Treasury Department construed this tax to include the salaries of judges, and deducted the amount of the tax from their salaries. Against this action the then Chief Justice of the Supreme Court of the United States, Mr. Justice Roger B. Taney, protested in a formal letter of February 16th, 1863, to S. P. Chase, Secretary of the Treasury. In his letter he called attention to the first section of the third article of the Constitution, and its provision that the compensation of the judges should not be diminished during their continuance in office. He asserted that the act, as construed, would diminish the compensation of every judge three per centum, and that "if it can be diminished to that extent by the name of a tax, it may, in the same way, be reduced from time to time at the pleasure of the Legislature." His communication then continues with these pertinent comments:

"The Judiciary is one of the three great departments of the Government created and established by the Constitution. Its duties and powers are specifically set forth, and are of a character that requires it to be perfectly independent of the other departments. And in order to place it beyond the reach and above even the suspicion, of any such influence, the power to reduce their compensation is expressly withheld from Congress and excepted from their powers of legislation.

"Language could not be more plain than that used in the Constitution. It is, moreover, one of its most impor-

tant and essential provisions. For the articles which limit the powers of the Legislative and Executive branches of the Government, and those which provide safeguards for the protection of the citizen in his person and property, would be of little value without a Judiciary to uphold and maintain them which was free from every influence, direct or indirect, that might by possibility, in times of political excitement, warp their judgments."

The Chief Justice wrote in maintenance of a constitutional prerogative, and in the belief that the federal judges were disqualified because of interest and so could not hear and decide the question. The Secretary ignored the remonstrance and the Supreme Court, on March 10th, 1863, ordered it to be entered on its records. It will be found reported in full in 157 U. S. 701, 39 L. Ed. 1155, 1156. Nine years later, when Taney was dead, another Secretary of the Treasury came to the conclusion that the tax on the salaries of judges had been illegally withheld, and the amounts paid were refunded. *Memoir of Roger B. Taney,* Tyler, pp 431-435; *Swisher's Taney,* pp. 568, 569.

In the Income Tax Act of 1894, 28 Stat. 509, the salaries of the judges were not mentioned, and in the Acts of 1913, 1916, and 1917, 38 Stat. 114, 39 Stat. 756, 40 Stat. 300, 329, the salaries were expressly excepted from the income tax. So, it was not until the Act of 1919 that the income tax was attempted to be laid upon the compensation received by the judges of the Supreme and inferior courts of the United States. In a suit brought by a district judge to test the legality of this imposition, the United States District Court of Kentucky, 262 Fed. 550, held that an income tax on judicial salaries did not diminish the compensation of the federal judges within the meaning of the Constitution. An appeal was taken to the Supreme Court of the United States, and the case is reported as *Evans v. Gore,* 1920, 253 U. S. 245, 40 S. Ct. 550, 64 L. Ed. 887. By the Act of February 24th, 1919, ch. 18, sec. 213, 40 Stat. 1057, 1065, Congress passed an income tax law by which the salaries of the judges of

the United States courts were included in the term "gross income." The particular provision by which the compensation of a federal judge was included was section 213, which defined the term "gross income" to embrace all gains, profits, and income derived from salaries, wages or compensation for personal service "including in the case of the President of the United States, the judges of the Supreme and inferior court of the United States * * * the compensation received as such." Thus the point of constitutional law in issue is whether the salary of a federal judge could be included in his income so as to form a part of his income subject to the incidence of a federal income tax.

The case was fully argued and Justice Van Devanter wrote an able and vigorous opinion for the court, in which Chief Justice White and Associate Justices Mc-Kenna, Day, Pitney, McReynolds, and Clarke concurred. Justices Holmes and Brandeis dissented. The Court held (1) that the constitutional prohibition against the diminution of salaries of federal judges during continuance in office is to be construed as a limitation imposed in the public interest and not as a private grant for the benefit of the members of the judiciary; (2) that the Sixteenth Amendment, relating to the income tax, does not extend the taxing power to new or excepted subjects, but merely removes all occasion otherwise existing for an apportionment among the States of taxes laid on incomes from whatever source derived; and (3) that any diminution whose necessary operation and effect withholds or takes from a federal judge a part of the compensation promised by law for his services is forbidden by the constitutional provision, and the prohibition embraces and prevents diminution by taxation.

The argument was made that the tax was upon the judge's income, and, consequently, since the income was the money yield received by the judge from various sources, his salary or compensation, although included in his income for the purposes of taxation, was not diminished by the imposition of a tax upon an income of

which the salary might constitute the whole or a part, accordingly as he did or did not have other sources from which he derived a yield. It is difficult to follow reasoning which has different results by the simple device of calling the same thing "salary or compensation," for one result, and "income" for another result. And the opinion of the court in *Evans v. Gore, supra,* conclusively and finally demonstrates the error of this contention in the following words:

"Obviously, diminution may be effected in more ways than one. Some may be direct and other indirect, or even evasive as Mr. Hamilton suggested. But all which by their necessary operation and effect withhold or take from the judge a part of that which had been promised by law for his services must be regarded as within the prohibition. Nothing short of this will give full effect to its spirit and principle. Here the plaintiff was paid the full compensation, but was subjected to an involuntary obligation to pay back a part, and the obligation was promptly enforced. Of what avail to him was the part which was paid with one hand and then taken back with the other? Was he not placed in practically the same situation as if it had been withheld in the first instance? Only by subordinating substance to mere form could it be held that his compensation was not diminished. Of course, the conclusion that it was diminished is the natural one. * * * But it is urged that what the plaintiff was made to pay back was an income tax, and that a like tax was exacted of others engaged in private employment. If the tax in respect of his compensation be prohibited, it can find no justification in the taxation of other income as to which there is no prohibition; for, of course, doing what the Constitution permits gives no license to do what it prohibits.

"The prohibition is general, contains no excepting words, and appears to be directed against all diminution, whether for one purpose of another; and the reasons for its adoption, as publicly assigned at the time and commonly accepted ever since, make with impelling force for

the conclusion that the fathers of the Constitution intended to prohibit diminution by taxation as well as otherwise—that they regarded the independence of the judges as of far greater importance than any revenue that could come from taxing their salaries." Pages 254, 255, 40 S. Ct. page 553.

It has been urged upon our attention that this tribunal is not bound by *Evans v. Gore, supra,* but its authority on the question at bar is derived from the power and cogency of its reasoning in respect of a constitutional inhibition similar to that found in the Constitution of Maryland. It is furthermore the construction of a provision of a federal income tax statute which has its counterpart in the statute now before this court for construction. As in section 213 of the federal act, the term "gross income," as used in the statute passed by the General Assembly of Maryland, "includes gains, profits, and income derived from salaries, wages or compensation for personal services of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce or sales or dealings in property, whether real or personal, growing out of the ownership, or use, or interest in such property * * * also from rent, royalties, interest, dividends, securities or transactions of any business carried on for gain or profit, or gains or profits, and income derived from any source whatever, including gains or profits and income derived through estates or trusts by the beneficiaries thereof, whether as distributive or as distributable shares. The amount of all such items shall be included in the gross income for the taxable year ·in which received by the taxpayer," unless otherwise to be accounted for as of a different period. There are certain specified receipts which are not to be reported as "gross income," and certain deductions to be made from the total sum of the gross income. The sum of the "gross income," if there are no deductions, or the difference between the sum of the "gross income" and the sum of the deductions, if there are one or more allowable, is called the "net income," which is defined as "the gross income

of a taxpayer less the deductions allowed." Sections 216-219 of chapter 11 of Acts of Extra Session, 1937. Not only are the former federal income statute and the present income statute of Maryland substantially the same in regard to the question under consideration, but the conclusion reached is in harmony with the memorial of Chancellor Bland, and the view of that distinguished Maryland lawyer and jurist, Chief Justice Taney. In Taney's letter, the protest is against "the right of the Legislature to diminish in this or any other mode the compensation of the Judges when once fixed by law." Chancellor Bland is equally explicit: "The salary of the chancellor is to be secured to him; that is, it shall not, at any time, on purpose, or by neglect, be withheld or diminished, during the continuance of his commission. This, the constitution has declared, shall not be directly and purposely done by the General Assembly; and surely, what is prohibited, and therefore, cannot be directly done, can never be accomplished by any contrivance or indirect movement." 1 Bland, 671; *Thomas v. Owens*, 4 Md. 189, 226-229. It should, also, be noted that in *Calvert County v. Monnett*, 1933, 164 Md. 101, 164 A. 155, 156, the provision of the Constitution (article 3, section 35) that the salary or compensation of any public office shall not be increased or diminished during his term of office was before the court. The only difference between the constitutional prohibitions construed in the case last cited and the prohibition for consideration in the present appeal is that the inhibition in the former case was against *an increase in compensation as well as against its dimi-nution*. While not applicable to the judiciary, the provision is sufficiently analogous to give pertinency to the fact that the court did not construe its effect narrowly but held it to apply to those holding offices of legislative creation as well as those holding offices directly established by the Constitution.

The opinion, which was written for the court by Chief Judge Bond, said: "The present prohibition is comprehensive in terms and ordinary meaning. And the consti-

124

tutional purpose of protecting officers from improper pressure by threats of diminution of compensation would seem applicable to officers without distinction with re-spect to the origins of their offices." The provision applicable to the judiciary of Maryland is none the less comprehensive in terms and ordinary meaning. So, in consonance with the principles of construction applied in *Calvert County v. Monnett, supra,* it may be found that the proper construction of the constitutional prohibition in the instant case protects the judges from the diminution of their salaries by an income tax, whether operating directly or indirectly. See *Anne Arundel County v. Goodman,* 172 Md. 559, 561, 192 A. 325.

It is submitted that this conclusion is irrefragably supported by *Evans v. Gore, supra;* that it is sustained by the legal principles inculcated by our decisions and that it is confirmed by the genius of the constitutional structure of the State. *Supra.* The latest affirmation of this State's consistent policy was in 1891, when the voters of the State adopted an amendment to the Constitution which is popularly known as the Budget Amendment, and is found in section 52 of article 3 of the Constitution. By the Budget Amendment one of the grand divisions of the budget bill to be submitted to the General Assembly is designated by the title "Governmental Appropriations," and among the appropriations necessarily incorporated in the "Governmental Appropriations" are the itemized appropriations: "(3) for the Judiciary Department, as provided by law, certified to the Governor by the Comptroller; * * * (5) for the salaries payable by the State under the Constitution and laws of the State." The Budget Amendment declares that: "The General Assembly shall not amend the budget bill so as to affect either the obligations of the State under Section 34 of Article III of the Constitution, or the provision made by the laws of the State for the establishment and maintenance of a system of public schools, or the payment of any salaries required to be paid by the State of Maryland by the Constitution thereof; and the General Assembly may amend

the bill by increasing or diminishing the items therein relating to the General Assembly, and by increasing the items therein relating to the judiciary, but except as hereinbefore specified, may not alter the said bill except to strike out or reduce items therein, provided, however, that the salary or compensation of any public officer shall not be decreased during his term of office; and such bill when and as passed by both houses shall be a law immediately without further action by the Governor." Article 3, section 52, subsection B. There are further provisions of the Budget Amendment which provide that the estimates for the legislative department, the judiciary and the public schools, when duly presented to the Governor, must be included by him in the budget without revision. Code (Flack), pp. 105-108; *Baltimore v. O'Conor,* 147 Md. 639, 643-646, 128 A. 759. It is doubtful if there can be found in the constitution of any state of the federal union more plain, precise and peremptory provisions promulgating the popular will that the judicial salary must not be reduced during continuance in office.

The great weight of reason and authority are in accord with the construction adopted. *Miles v. Graham,* 268 U. S. 501, 45 S. Ct. 601, 69 L. Ed. 1067; *Collector v. Day,* 11 Wall. 113, 127, 20 L. Ed. 122, 126; *Dobbins v. Erie County,* 16 Pet. 435, 450, 10 L. Ed. 1022, 1027; *Pollock v. Farmers' Loan & Trust Co.,* 157 U. S. 429, 604, 606, 15 S. Ct. 673, 39 L. Ed. 759; 13 *Opinions of Att. Gen.* (Hoar) 161 (1869) ; *Freedman v. Siegel,* 9 Fed. Cas. page 746, No. 5080; *Comm. ex rel. Hepburn v. Mann,* 5 Watts & S. 403, 415; *Comm. v. Mathues,* 210 Pa. 372, 394, 59 A. 961; *Bailey v. Waters,* 308 Pa. 309, 162 A. 819; *O'Donoghue v. United States,* 289 U. S. 516, 531, *et seq,* 53 S. Ct. 740, 77 L. Ed. 1356; *Sweatt v. Boston etc. Ry. Co.,* 23 Fed. Cas. p. 530, No. 13,684; *New Orleans v. Lea,* 14 La. Ann. 197; *Re Taxation of Salaries,* 131 N. C. 692, 42 S. E. 970; *Purnell v. Page,* 133 N. C. 125, 45 S. E. 534; *Long v. Watts,* 183 N. C. 99, 110 S. E. 765; *Cooley, Constitutional Limitations* (8th Ed.), vol. 2, pp. 1095-1097; *Willoughby on the Constitution of the United States* (2nd Ed.), sec.

87, p. 154, sec. 411, p. 711; *Principles of Judicial Administration, Willoughby,* pp. 357-360.

The State concedes that the Legislature has no power directly to reduce a judge's salary during his continuance in office. *Calvert County v. Monnett,* 164 Md. 101, 104, 164 A. 155; *Anne Arundel County v. Goodman,* 172 Md. 559, 192 A. 325. It is a sound principle of law that what is prohibited from being done directly by legislation is, also, prohibited from being done indirectly. Unless this were the rule applied, the inhibition would be ineffectual. *Miller v. Milwaukee,* 272 U. S. 713, 715, 47 S. Ct. 280, 71 L. Ed. 487; *Macallen Company v. Massachusetts,* 279 U. S. 620, 49 S. Ct. 432, 73 L. Ed. 874; *Baltimore v. O'Conor,* 147 Md. 639, 646, 647, 652, 128 A. 759; *Fairbank v. United States,* 181 U. S. 283, 294, 300, 21 S. Ct. 648, 45 L. Ed. 862; *Brown v. Maryland,* 12 Wheat. 419, 6 L. Ed. 678.

So, it must necessarily be sound that should an enactment diminish, either directly or indirectly, the compensation of a judge during his period of service, the enactment is invalid. *Supra.* The State, therefore, cannot prevail unless the effect of the income tax is neither directly nor indirectly to diminish the judicial salary. The State rejects the decision of the Supreme Court in *Evans v. Gore, supra,* and relies upon the dissent of Mr. Justice Holmes and Mr. Justice Brandeis in that case. The court here cannot adopt that view, as its judgment is that the prevailing opinion of Mr. Justice Van Devanter anticipated and ably refuted the points made in the dissent. The decisions cited of *Dupont v. Green,* 1937, 38 Del. 566, 195 A. 273, which reversed a decision of the Superior Court for New Castle County, *Green v. Dupont,* 37 Del. 46, 180 A. 437; *Martin v. Woolford,* 1937, 269 Ky. 411, 107 S. W. 2nd 267; *Poorman v. State Board,* 1935, 99 Mont. 543, 45 P. 2nd 307, and *Taylor v. Gehner,* 1932, 329 Mo. 511, 45 S. W. 2nd 59, were all rendered after *Evans v. Gore, supra,* and follow specifically the dissent in *Evans v. Gore, supra,* although in *Dupont v. Green, supra,* the effect of the income tax upon a salary of the Attorney General of Delaware was involved and the court declined to express

its opinion with respect to the salary of a judge. 195 A. page 275. See *Comm. v. Mathues*, 210 Pa. 372, 59 A. 961. The reasoning of the court, however, clearly indicated it would follow the dissent.

Another case much relied on is *State ex rel. Wickham v. Nygaard*, 1915, 159 Wis. 396, 150 N. W. 513. The decision was a few years before *Evans v. Gore, supra*. The single provision of the Wisconsin Constitution which related to the permanency of compensation was the inhibition: "nor shall the compensation of any public officer be increased or diminished during his term of office." The court stated that if this were the only clause of the constitution, there was not much authority to be found, but what little there was tended to support the claim of the circuit judge that his judicial salary was not subject to the income tax. The Wisconsin Constitution first provided: "The rule of taxation shall be uniform, and taxes shall be levied upon such property as the Legislature shall prescribe," Const. Wis. 1848, art. 8, sec. 1; but this original section was amended in 1908 by the addition: "Taxes may also be imposed on incomes, privileges and occupations, which taxes may be graduated and progressive, and reasonable exemptions may be provided."

The court stressed the fact that the amendment was broad and sweeping, making and containing no exceptions, and construed the change in the constitution to authorize the taxation of incomes in any case where the power rests in the State to impose such a tax. In none of these decisions are the constitutional provisions against a diminution of judicial salary so explicit as those of the Maryland Constitution, as clarified and strengthened by the specific and imperative safeguards of the Budget Amendment. Const., art. 3, sec. 52. While the constitutions of Delaware, Kentucky, Montana, Missouri and Wisconsin present substantial differences in their provisions which relate to the compensation of the judiciary, and afford grounds of distinction which must be considered, nevertheless the reasons which controlled the appellate tribunals of those states are of greater impor-

tance. *Cooley on Taxation* (4th Ed.), sec. 1748, sec. 1749, n. 63, p. 1749. As has been stated, these reasons are substantially those presented by Mr. Justice Holmes in *Evans v. Gore, supra,* and concurred in by Mr. Justice Brandeis. Their refutation may well be left to the prevailing opinion of Mr. Justice Van Devanter, but the importance and unusual nature of the pending appeal seem to require a full presentation of the views of this court.

It may be first noted that Mr. Justice Holmes did not dissent in *Miles v. Graham,* 1925, *supra,* which followed *Evans v. Gore,* 1920, *supra,* although Mr. Justice Brandeis did. As a further indication of an acceptance of the holding in *Evans v. Gore,* Mr. Justice Holmes cites that case with approval in *Gillespie v. Oklahoma,* 1922, 257 U. S. 501, 42 S. Ct. 171, 172, 66 L. Ed. 338, saying "In cases where the principal is absolutely immune from interference an inquiry is allowed into the sources from which net income is derived and if a part of it comes from such a source the tax is *pro tanto* void. *Pollock v. Farmers' Loan & Trust Co.,* 157 U. S. 429, 15 S. Ct. 673, 39 L. Ed. 759; *Id.,* 158 U. S. 601, 15 S. Ct. 912, 39 L. Ed. 1108; a rule lately illustrated by *Evans v. Gore* [1920], 253 U. S. 245, 40 S. Ct. 550, 64 L. Ed. 887, and applied in a case somewhat like the present by the Supreme Court of Hawaii, *Oahu Ry. & Land Co. v. Pratt,* 14 Hawaii 126." We take the Supreme Court to hold, as Mr. Justice Holmes wrote for the court—Mr. Justice Pitney, Mr. Justice Brandeis and Mr. Justice Clarke dissenting—that *Evans v. Gore* is authoritative, and that if judicial compensation is immune from diminution by taxation "an inquiry is allowed into the sources from which net income is derived and if a part of it comes from such a source the tax is *pro tanto* void," and the amount of the judge's salary would be deducted.

What then are the grounds upon which the contention rests that judicial salaries received by an incumbent during his occupancy of office may be taxed under a statute passed during his holding of the office? The reasons urged are (first) that the constitutional provision has

no reference to a case like the one here considered; and (second) that the tax on net income is not a tax on salary, although it may form all or a part of the net income. It is submitted that these reasons are not sound, and are refuted in the decisions of *Evans v. Gore, supra,* and of the other cases here cited. By way of emphasis, it may be said, in further reply to one of the grounds of the first reason that the contention that the liability of a member of the judiciary to pay taxes on his salary cannot possibly be made an attack on his independence does not bear examination. The answer to this assumption is to be found in its permitted consequences. The salary received by a judge is not the income of real or personal property, but the monetary reward paid by the State for his personal service in the discharge of his official duties, and no form of income offers less resistance to the lawful imposition of a tax. The admitted constitutional limitations, which, for the preservation of his independent position, prevent a diminution of a judge's salary during his incumbency by legislation which would reduce his compensation by a change in its amount or by the levy of a specific tax, would afford him no adequate guaranty if the General Assembly may impose an income tax upon his net income from which his salary may not be excluded. If under the guise of an income tax, the salary may be taxed as income, the present rate may be increased to any percentage the Legislature wills. The right of the sovereignty to tax is a power to consume and to destroy.

Nor will there be found any protection in the incidence of the tax upon other taxpayers. No method of taxation equals the income tax in the multiform classification of taxpayers indulged and in the variety of rates imposed according to the respective amounts of the incomes. The most numerous class embraces all those who are excluded from paying the tax because their income does not exceed the prescribed minimum. It is this non-taxed class which in a democracy dominates the fiscal policy of the nation, since its number makes for political predominance. If the constitutional requirement of equality and uniformity

in the imposition of taxes upon real estate and tangible personal property, and the laying of duties or taxes with a political view for the good government and benefit of the community, permit a multiplication of classes for taxation according to wealth in income from those sources and from the exertions of its possessor, and the judiciary are within the purview of such legislation, then the principle, once allowed, may be carried to any extent and the judiciary will sit in subserviency to the will of the Legislature. The loss of independence will be measured not so much by the certainty of the present as by the apprehension of future antagonistic or retaliatory legislation. The income tax now sought to be imposed diminishes the salary by the entire amount of the tax, if the salary is the sole income of a judge. If the judge have other income, then his salary is diminished in part to the extent of its proportionate contribution to the payment of the tax. If this be law, the extent of this method of diminution in the future will depend wholly upon the exercise, from time to time, of legislative pleasure, and the peril which the Constitution sought to prevent will have been revived by judicial fiat.

The comment that the judges should pay the taxes of every man as their share in the cost of the institutions upon which their well-being, if not their life, depends, is an *argumentum ad hominem*. If the Constitution of Maryland, which is the supreme law on this question, forbids the laying of the tax because it renders the judiciary dependent upon the legislative and executive branches of the government, it becomes the paramount and solemn obligation of the judiciary to defend and maintain unimpaired the constitutional mandate in its full vigor and effect against all subversive legislation. In such an emergency acquiesence is recreancy. The articles of the Constitution which limit the powers of the legislative and executive branches of the government, and those which establish safeguards for the protection and security of the citizen in his person and property, would quickly lose their value if there were no judiciary

to enforce and preserve them without fear or favor or influence from any quarter. The exemption of the judicial compensation from reduction is not in any true sense a gratuity, privilege, or exemption. It is essentially and primarily compensation based upon valuable consideration. The covenant on the part of the government is a guaranty whose fulfilment is as much a part of the consideration agreed as is the money salary. The undertaking has its own particular value to the citizens in securing the independence of the judiciary in crises; and in the establishment of the compensation upon a permanent foundation, whereby judicial preferment may be prodently accepted by those who are qualified by talent, knowledge, integrity, and capacity, but are not possessed of such a private fortune as to make an assured salary an object of personal concern. On the other hand, the members of the judiciary relinquish their position at the bar, with all its professional emoluments, sever their connection with their clients, and dedicate themselves exclusively to the discharge of the onerous duties of their high office. So, it is irrefutable that the guaranty against a reduction of salary by the imposition of a tax is not an exemption from taxation in the sense of freedom from a burden or service to which others are liable. The exemption for a public purpose or a valid consideration is merely a nominal exemption, since the valid and full consideration or the public purpose promoted is received in the place of the tax. *Theory and Practice of Taxation* (1900), *D. A. Wells,* p. 541. On every form of property, except their salaries, the judges pay taxes, and this one exception is not founded in privilege, but is a covenant made pursuant to a wise public policy and upon a valid and valuable consideration. *Whittington v. Polk,* 1 H. & J. 236, 249; *Bradford v. Jones,* 1 Md. 351, 371.

The conventions which framed the Constitution of the United States, and those which formulated the several constitutions of this State, understood that the provision against the diminution of compensation of public officials is a denial of those methods by which the legislative

branch of the government might accomplish that purpose. The available methods are limited to statutes which will reduce the amount of compensation either by an act which will prescribe a less amount, or by an act which will lay a tax on the amount of the salary. Incomes had been taxed in the colonies before the adoption of the Federal Constitution, and so it was known that under the effect of a general income tax law the salary, even though paid to the official without reduction at its source, would generally be diminished by the effect of the tax. See Laws of 1777, ch. 22, secs. 5 and 6. Thus, by the provision against the diminution of official salaries and the adoption of the constitutions by the people, the people declared, by necessary implication, that the salaries would not be diminished by taxation.

The answer attempted to be made by the State is that the compensation ceases to be a salary and becomes income instantly on its receipt by the judge. Before its payment the salary was prospective income. When it was paid it was income accruing due as salary, and after it was received it lost none of its quality as income derived from the State in the form of salary. For the purpose of the income tax law, its nature with reference to its origin never changed from the moment of its receipt, no matter when or how it was used or kept, paid out or absorbed in a capital account. Whatever its liability to the imposition of an income tax became fixed as of the date of its accruing due and receipt. If the salary-income was not liable then to the payment of the tax pursuant to the terms of the statute, its status would not be affected by its amount either being called "gross income," if the judge had no other income; or being included in the sum of other items of income subject to the tax and called "gross income," if the judge had other sources of income, since no item of income may, for the purpose of taxation, form the whole or any part of the "gross income," unless such item of income is separately subject to the imposition of the tax. While the computation of the income tax to be paid is upon the "net income," which is the differ-

ence between the amount of the "gross income" and the sum of the deductions of the allowances permitted by the statute, the amount of no item of income which is not subject to the income tax may form any part of the amount of the "net income." Thus every item of income preserves its identity of amount and nature, for the purpose of determining whether or not it should be included or excluded in the amount upon which the income tax is to be paid. Acts 1937, Ex. Sess., ch. 11, secs. 216, 217, 222, 223, 227, 228, 231, 232, 248, 249; *Gillespie v. Oklahoma,* 257 U. S. 501, 505, 42 S. Ct. 171, 66 L. Ed. 338, 341.

The notion that as soon as salary-income is received it is irretrievably commingled with the general income of the owner for the purpose of taxation, so that the amount of the salary-income may not be separately considered as having been illegally included as part of the net income is, of course, untenable on principle and authority. In the form prepared by the State and found on this record, there are ten items or sub-divisions of income in the title "gross income," with six accompanying explanatory schedules for details. The heading of the first is "Salaries, Wages, Commission, Fees, etc. (State name and address of employer)". Under this item is given the amount of the judge's salary received from the State. Under the caption "Deductions," there are seven items or headings for separate deductions, with six schedules for explanation and details. Item 18 is entitled "Other Deductions Authorized by Law (Explain in Schedule G)." It is after this heading that the amount of the salary is set for deduction. Chapter 11, sec. 238. The statute exacts that the return to the comptroller by the person required shall state "especially the items of his entire income and the items which he claims as deductions and exemptions allowed by this sub-title." *Ibid,* secs. 232, 241, 242. The legislation provides for revisions and appeals and refunds for the correction and rectification of mistakes and errors in the enforcement of the law.

The particular circumstances of a judge admit of three typical situations. He may have no other source of in-

come than his compensation as judge and have no allow-
ances for deduction. Again, he may have, in addition to
his salary, other income, and their sum, after all deduc-
tions, if any, make his net income large enough for the
tax to apply. Or his losses allowable as deductions may
be in excess of his salary alone or in combination with
income from other sources. These instances do not com-
prise all, but are enough for illustration. In the first
instance, the potential levy of the income tax upon his
salary from the moment of its receipt continues to the
day of accounting, and the amount of his salary would
be his "gross income" and, since there are no deductions,
the gross income would become his "net income" upon
which would be calculated the income tax. As the gross
and net incomes are identical, the potential levy upon the
whole amount of his salary from its receipt would, on
the final day of accounting, become consummate upon
that identical amount, and his salary would be diminished
by the full amount of the tax. On the second sup-
position, the potential levy of the income tax upon his
salary from the time of its receipt, and upon his other
income from the times of its receipt, would continue
to the final day of accounting, and the sum of his salary
and other income to that date would constitute his "gross
income," and, if there were no deductions, the "gross in-
come" would become his "net income," but should there
be deductions allowed, the difference between their sum
and the "gross income" would make his "net income." In
either event, the tax would be based on the "net income,"
which, as it comprised proportionately reduced salary and
other income, would diminish in the same proportion the
salary received; and the potential levy would, on the
final day of accounting, become consummate as to the
salary in the same proportion. The third illustration is
where the potential levy upon his income received would
continue to the day of final accounting, when it would be
found that the sum of his income of all sources, includ-
ing his salary, and so forming the judge's "gross in-
come," was eliminated by his losses allowed and other

deductions, so that there would be no "net income" and, because of that, the potential levy upon his salary and income failed of consummation on the day of final accounting. In this instance, the salary could not be said to have been diminished, as no tax accrued due. The result in this third instance does not support the contention of the State that the tax is not laid on the compensation of the judge. It simply demonstrates that the potential levy or diminution of the salary from the time of its payment to the day of final accounting is released or abated as a result of conditions arising independently of the salary, but affecting the net income of the taxpayer adversely to the point of extinction. Instead of a diminution, the economic result to the judge is to increase his salary over the other judges to the extent of the income tax on the allowances made. If this be not the true effect, the possibility noted does not militate against the view that the act is void so far as it relates to the salaries of the judges. The test of the constitutionality of the statute with respect to the judiciary is not that it will necessarily diminish the salary of a judge, but that it may be done by its authority. *Ulman v. Baltimore,* 72 Md. 587, 596, 20 A. 141, 21 A. 709; *Eubank v. Richmond,* 226 U. S. 137, 144, 33 S. Ct. 76, 57 L. Ed. 156, 159. It has been shown not only that it may, but that it will. The record before the court supplies a mathematical demonstration of that fact and of the accuracy of the analysis attempted.

The State has cited decisions of the Supreme Court of the United States which, in our opinion, do not reverse or modify *Evans v. Gore, supra.* The attention of the court has been directed to decisions of the British and Colonial courts which we do not discuss because of the fundamental differences in the conception of constitutional law in the United States and that which prevails in foreign jurisdictions. *Dicey on the Law of the Constitution,* 140, 141. For reference to these cases and annotations on the points involved, see *Evans v. Gore,* 253 U. S. 245, 40 S. Ct. 550, 64 L. Ed. 887; *Taylor v. Gehner,*

329 Mo. 511, 45 S. W. 2nd 59; *Brush v. Commr.*, 300 U. S. 352, 57 S. Ct. 495, 81 L. Ed. 691; *Dupont v. Green*, 38 Del. 566, 195 A. 273.

The decisions of this tribunal adhere to the principle stated by the great Chief Justice Marshall in *Marbury v. Madison*, 1 Cranch 137, 176, 2 L. Ed. 60: "The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained?" *Thomas v. Owens*, 4 Md. 189, 227, and *supra*. The judgment appealed from must be affirmed.

> *Judgment affirmed, with costs to the appellant.*

BOND, C. J., filed a dissenting opinion as follows, in which SLOAN and MITCHELL, JJ., concurred.

The view of a majority of the judges, that the amount of a judge's salary from the state must be omitted from the basis of calculating his state income tax, has received an acceptance in decisions elsewhere sufficient to demonstrate that careful seekers for the correct conclusion may think it not only tenable, but compelled. It seems to me, however, that the weight of authority and reason is against it.

The question is a new one in the state. All the Constitutions, beginning with the Declaration of Rights of 1776, art. 30, have included prohibitions against diminishing the salaries. The first followed more closely the wording of the English act of 1760 (1 Geo. III, ch. 23, sec. 3), in which, completing the Act of Settlement, this final step toward the independence of judges was taken, and provided that their salaries "ought to be secured to the Chancellor and the judges during the continuance of their commission." An amendment in pursuance of an Act of 1804, chapter 55, ratified in 1805, adopted the present

phraseology from the Constitution of the United States, article 3, section 1; and it has been continued in all the subsequent Constitutions. In the Constitutions of 1851, art. 4, secs. 4 and 9, and 1864, art. 4, sec. 28, increase as well as diminution of a judicial salary was prohibited. And the protection has been given in the last three Constitutions, not only to the salaries of judges, but to the salaries of all public officers, constitutional and legislative, state and local, whose salaries might otherwise be diminished by the Assembly. "Nor shall the salary or compensation of any public officer be increased or diminished during his term of office." Constitution of 1851, art. 3, sec. 23, 1864, art. 3, sec. 34, and 1867, art. 3, sec. 35. *Calvert County v. Monnett,* 164 Md. 101, 164 A. 155. But if during the existence of these provisions there has been a tax touching the offices or salaries of judges the present question of its constitutionality has not been raised in any reported case. So far as this jurisdiction is concerned, it is an original case that the court has before it.

With cases of plain, direct reductions in amounts previously fixed for official salaries the court need not concern itself; we have no such case to deal with. And in cases on the relation of taxes to salaries, and their possible effect as diminutions in the constitutional sense, we find differences in the taxes considered and different conceptions controlling. In *Northumberland County Commrs. v. Chapman,* 1829, 2 Rawle 73, the Supreme Court of Pennsylvania held that a tax on "all offices and posts of profit," was collectible from judges, notwithstanding a provision in the Pennsylvania Constitution of 1790, art. 5, sec. 2, that salaries of judges should not be diminished during their continuance in office. There was, in the opinion of the court, no diminution of them; "the demand of the judge upon the commonwealth for his services is not in the least degree abated." The same court, in *Comm. v. Mann,* 5 Watts & S. 403, held that a tax assessed on salaries and emoluments of public office, to be deducted before payment, was unconstitutional as

138

a diminution of the salaries. In the opinion, the court remarked, however, that "The property of a judge, his income, whether derived from this or any other source, we admit is a proper subject of taxation. His security will then consist in being placed on the same footing with other citizens, and an abuse of them by any will be speedily corrected." On the other hand, in *Dobbin v. Erie County Commrs.*, 16 Pet. 435, 10 L. Ed. 1022, a tax on the office of a captain in the United States revenue service was held a diminution of the salary provided for him by the federal government, and invalid. In *New Orleans v. Lea*, 1859, 14 La. Ann. 197, taxation of the salary of a judge was again held unconstitutional, as a diminution of it.

In 1863, Chief Justice Taney, in a letter to the Secretary of the Treasury, protested that a Civil War tax of three per cent on the salaries of all officers, to be deducted before payment (Act July 1, 1862, ch. 119, secs. 90 and 91), amounted to a diminution of the salaries, and could not constitutionally apply to those of judges, and the Supreme Court ordered the letter to be published in the reports, 157 U. S., 701. The tax appears to have been deducted until 1869, when the Attorney General, E. R. Hoar, declared it not deductible. *Foster, Income Tax,* sec. 28. Subsequently in the lower court case of *Freedman v. Siegel,* 9 Fed. Cas. page 746, No. 5080, a general income tax was held inapplicable to the income of a federal judge to the extent of his official salary; and in *Sweatt v. Boston etc. R. Co.,* 23 Fed. Cas. page 530, No. 13,684, a tax directly upon a judicial salary was held invalid.

It is suggested that in the elaborate enumeration in the Maryland statute (Acts 1937, Ex. Sess., ch. 11, sec. 216) of sources and kinds included in gross income, from which the taxable net income under the statute shall be ascertained, this tax is laid specifically and directly on judicial salaries, because in the beginning there are enumerated "gains, profits and income derived from salaries, wages or compensation for personal services of what-

ever kind and in whatever form paid," etc. The section is the definition of income under the statute, similar to that contained in many, if not in all, income tax statutes. There is no separate, specific tax laid on salaries, none except on income, and I do not see that this definition of income for that purpose can have any effect to change the incidence of the taxation.

The majority opinion in *Evans v. Gore,* 253 U. S. 245, 1920, 40 S. Ct. 550, 64 L. Ed. 887, the first case in that court on the effect of a general income tax, supplemented by *Miles v. Graham,* 268 U. S. 501, 45 S. Ct. 601, 69 L. Ed. 1067, is, of course, strong authority for holding that such a tax is unconstitutional to the extent that a judicial salary forms the basis of computing it. It has been followed, however, in only one state court, the Supreme Court of North Carolina, in *Long v. Watts,* 183 N. C. 99, 110 S. E. 765. An opinion by the Attorney General of that state, finding a tax on salaries unconstitutional, had previously been accepted. *Matter of Taxation of Salaries of Judges,* 131 N. C. 692, 42 S. E. 970. Except in that one state, the majority opinion in *Evans v. Gore,* as is pointed out in what seems to be the most recent case on the subject, "has not found favor in the State Courts." *Dupont v. Green,* 1937, 38 Del. 566, 195 A. 273, 277. Nor has it been found acceptable in some cases in the British Dominions and England dealing with the same question.

A number of the state constitutions, including that of Maryland, contain in a prohibition of diminution of salaries of any public officers whatever, some indication of their conceptions of diminution which is not found in the Constitution of the United States. The same meaning must have been in the minds of the framers in exactly the same prohibitions. In some constitutions only one clause is used for all the prohibitions. "Where the same language is used in different clauses of the constitution, upon the same or similar subjects, it must receive the same construction, unless some particular reason to the contrary can be signed." *Roberts v. Gibson's Excr.,* 6 H. & J. 116; *School Commissioners v. Goldsborough,* 90 Md.

140

193, 202, 44 A. 1055; *Calvert County v. Monnett*, 164 Md. 101, 104, 164 A. 155; *Baltimore & Annapolis. R. R. Co. v. Lichtenberg*, 176 Md. —, 2 A. 2nd 734. What would, within the meaning of the framers, be diminution of the salary of a judge, would be diminution of the salary of a county treasurer, or any other officer, state or local. *Calvert County v. Monnett, supra.* And if we are to give the clause a meaning to accomplish objects we think the framers had in mind, those objects must have been sought for judges and all other officers alike. But it seems to strain the words of the framers to suppose that they intended by their brief prohibition to secure a tax immunity for all officers, high and low, throughout the State and its local governments, to whom they extended the prohibition. And I am unable to believe that the framers would entertain with respect to the incomes of all these officers the solicitude which we now attribute to them with respect to the incomes of judges.

In 1915 it was held by the Supreme Court of Wisconsin that the amount of a judge's salary must be included in the basis of computing his state income tax. The court considered that the prohibition against diminution of the salary, read together with a constitutional authorization of an income tax, and a requirement that state taxes must be uniform, allowed no execption to the judges. *State ex rel. Wickham v. Nygaard*, 159 Wis. 396, 150 N. W. 513. In *Taylor v. Gehner*, 329 Mo. 511, 45 S. W. 2nd 59, 60, decided in 1932, judges were by a unanimous court held subject to a general state income tax to the extent of their salaries. "Taxes," said the court, "are proportional contributions imposed by the state upon individuals for the support of government and for all public needs. The power to tax is not granted by the Constitution; it is inherent in the Legislature. There are no restrictions or limitations upon the power, except such as are expressly imposed by the State and Federal Constitutions. Section 33, article 6 of the Constitution [of Missouri, Mo. St. Ann.] does not fall within that category. It was never designed or intended to be a limitation upon the taxing

power. * * * Nor can it be possible that said section 33 was designed to relieve judges from the burdens of taxation. From its historical background, the purpose intended to be subserved by the section is perfectly well known; it is one of the checks and restraints imposed to secure the independence of the judiciary. It is not a tax exemption provision." And Mr. Justice Holmes' observation in *Evans v. Gore* is quoted: "To require a man to pay the taxes that all other men have to pay cannot possibly be made an instrument to attack his independence as a judge."

The validity of an income tax based on salaries received by judges was again in question in *Poorman v. State Board,* 1935, 99 Mont. 543, 45 P. 2nd 307, and, again, it was found valid, by a majority of the judges. They agreed that legislative reductions of the amounts fixed for salaries, and taxes directly on salaries, would come under the constitutional ban. The "host" of state officers protected by the constitutional prohibition was taken to indicate that it was not intended to affect a general net income tax on judges. The Court of Appeals of Kentucky, three judges dissenting, came to the same conclusion in 1937 with respect to a state income tax. *Martin v. Wolfford,* 269 Ky. 411, 107 S. W. 2nd, 267. That court regarded *Evans v. Gore, Miles v. Graham,* and *Long v. Watts,* as inapplicable. And in the most recent case found, that of *Du Pont v. Green,* Del. 1937, *supra,* the court reached the same conclusion, all judges agreeing.

In England it seems never to have been thought that imposition of a general net income tax on judges along with all other citizens constituted a departure from the principle of the Act of 1760. The Income Tax Act of 5 & 6 Vict., ch. 23, expressly included the salaries of judges in the basis of the tax. In Australia, in 1907, an Order in Council which had superior, binding force, and forbade, in the words of the Act of 1760, the diminishing of judges' salaries, was cited as preventing application of an income tax to the amounts of the salaries, but the

High Court of Australia held without dissent that there was no inconsistency. *Cooper v. Commissioner,* 4 Comm. L. R. 1304. *Evans v. Gore* had not yet been decided in this country, but the protest of Chief Justice Taney in 1863 against the tax deduction was before the court. "I think," said Griffith, C. J., "that the inclusion of a judge's salary with the rest of his income in an aggregated fund, upon the balance of which, after specific deductions, an income tax is charged in common with the incomes of all other citizens of the State is different in principle from a direct diminution of his salary *qua* salary." And Barton, J., added: "The object of the section on its face is to secure the due payment of the salaries according to the terms on which they are allotted, and as long as the commissions of those entitled to them remain in force. That is what is said, and I think it is all that is meant. In this sense the notion of a reduction (e. g. by statute) is excluded, and looking at the origin of the provision, and the clear object to be inferred from the words of the Act of Settlement, I have no doubt that the judicial independence was meant to be protected by that and subsequent legislation, so far that even a sovereign Parliament would not dream of reducing a Judge's salary during his tenure of office. But the ordinary taxation of the State stands on a different footing. It is imposed on all who come within the area prescribed for taxation, whatever their rank or occupation. It is raised for revenue purposes, and one does not think of a Colonial Treasurer trying to levy a tax on the whole people, yielding many hundreds of thousands of pounds, for the mere purpose of vindictively obtaining a few pounds from one or half a dozen judges."

Section 100 of the South Africa Act contained a provision that the remuneration of judges should "not be diminished during their continuance in office," and the decision in *Evans v. Gore* was cited in opposition to the application of a local income tax to the amounts of judicial salaries, but without dissent it was held applicable nevertheless. *Krause v. Commissioner,* 1929, So. Afr.

App. Div. 286. Wessels, J. A., because of his interpretation of the local statute, found it unnecessary to deal with arguments founded on *Evans v. Gore,* but the other judges debated them at length. Stratford, J. A., said in his opinion: "But for a decision of the Supreme Court of the United States in *Evans v. Gore,* I venture to think *that the idea would not readily occur to any judge.*" And quoting the expression of the majority opinion in *Evans v. Gore,* that the objects of the constitutional prohibition were to attract good and competent men to the bench and to promote that independence of action and judgment which is essential, he remarked (page 295); "But having thus alluded to the purpose of the prohibition, this important consideration is entirely disregarded, *for it is not shown how the imposition of an income tax in any way impairs the independence of a judge.* * * * It is indeed difficult to appreciate in what manner a judge's independence of action is attacked by having to contribute, with all other citizens of the Union, toward the maintenance of good order and government of the State in which he lives. The majority judgment (in *Evans v. Gore*), however, is solely based on the conclusion that income tax has the 'effect' of diminishing the salary. Now this is only true in the sense that every compulsory expense diminishes a man's salary. And if the ultimate effect is to be the test, then a poll tax or a house tax would have that effect, so also a general rise in the cost of living due to the depreciation of currency. The salaries of the judges of Great Britain were very much lessened in value by the Government's departing from the gold standard. By such departures their salaries were, in effect, diminished, and that, too, was brought about by the action of the Government which paid them. But the judges suffered with the rest of the community and it would be fantastic to think their independence was affected by the general policy of the Imperial Government."

The British North American Act of 1867, which has constitutional force, as we should say, contains (section

100) a similar protection for judicial salaries, and no exception was made of them in an income tax of Saskatchewan of 1932; and the question of applicability to those salaries went before the court of ultimate appeal, the Judicial Committee of the Privy Council, in *The Judges v. Attorney General of Saskatchewan,* 1937, 53 Law. T. Rep. 464. The Committee were unanimously of the opinion that the tax did apply. "Neither the independence nor any other attribute of the judiciary," said the opinion, "can be affected by a general income tax which charges their official incomes on the same footing as the incomes of other citizens."

While the courts of two jurisdictions, then, the federal courts, following *Evans v. Gore,* and the Supreme Court of North Carolina, have adopted the view that a general income tax of the kind with which we are now dealing is not collectible from judges to the extent of their incomes from salaries, the opposite view has been taken by the Supreme Court of Pennsylvania, in a *dictum,* and by the Supreme Court of Wisconsin, the Supreme Court of Missouri, the Court of Appeals of Kentucky, the Supreme Court of Delaware, the High Court of Australia, the South African Appellate Division, and the Judicial Committee of the Privy Council in England. With these should be considered the opinion of the majority of the Supreme Court of the United States in *Hale v. State Board,* 302 U. S. 95, 58 S. Ct. 102, 82 L. Ed. 72. In the State of Iowa, holders of bonds exempted from taxation of principal or interest were assessed with respect to amounts received from the bonds for "personal net income taxation" by the State. The Supreme Court, accepting the analysis of the state tribunals, that the income tax was an excise and not a tax on property, a tax on the person rather than on the interest from the bonds, held that as such it was no impairment of the exemption contract. "Unless the foregoing analysis is faulty," said the court (page 108, 58 S. Ct. page 106), "the tax complained of by appellants is not laid upon the obligation to pay the principal or interest created by the bonds, at all events within the mean-

ing of the contract of exemption. The tax is laid upon the net results of a bundle or aggregate of occupations and investments. Under a statute so conceived and framed a man may own a quantity of state and county bonds and pay no tax whatever. The returns from his occupation and investments are thrown into a pot, and, after deducting payments for debts and expenses as well as other items, the amount of the net yield is the base on which his tax will be assessed."

As this court, therefore, looks to authority, the weight of it appears favoring inclusion of judicial salaries in the basis of computing a judge's income tax. Reasons which seem to me to have the greater weight are stated in the cases reviewed. I would add that the mere meaning of the words of the constitutional provision, prohibiting the diminishing of official salaries, if taken in their ordinary acceptation, do not support the construction the court is adopting. If an income tax based on the amount of a judge's salary should be, within that meaning, a diminishing of it by the legislative enactment, then it would be accurate to say that the salary of every private citizen subject to the tax is diminished by Act of Assembly; but we know that is not the sense of the words used. The devaluation of the dollar as a result of the Gold Reserve Act of February 1st, 1934, more directly reduced compensations of all public officers, yet we do not think of it as a violation of the prohibition against diminishing them. If by some means it had been ordered that only the content of money paid to judges should be reduced, there might be agreement in holding that an unconstitutional diminution resulted, but the general incidence of the devaluation prevents our giving it that meaning. So it would logically be under the state income tax.

By that tax nothing is done to the salary as a salary. It is not taxed as salary; no deduction is made from it; it is paid in full. It is not then earmarked, but is mingled with the general income, and loses its identity as salary. The subject on which the tax is computed is a net fund after exemptions and allowances made, and the tax is

laid without relation to the sources. Such a loss of identity removes money from exemptions which might attach in its former situation. *Bass, Ratcliff & Gretton, Ltd., v. State Tax Commn.*, 266 U. S. 271, 45 S. Ct. 82, 69 L. Ed. 282; *Lawrence v. State Tax Commn.*, 286 U. S. 276, 62 S. Ct. 556, 76 L. Ed. 1102. "The net income by way of salary has come into the hands of the recipients to do with as they choose; it has lost its identity as salary and the tax is a direct tax against the individuals—not against salary as property—and constitutes one of the ordinary burdens of government from which none of us should be exempted merely because we happen to be 'public officers,' while we look to that government for the protection of lives and liberties, and the enjoyment of the property which we may purchase with the income derived from our salaries." *Poorman v. State Board*, 99 Mont. 543, 560, 45 P. 2nd 307, 314.

As I see it, what is secured to a judge under the view adopted by the majority is not only an undiminished salary, but an undiminished salary plus a tax immunity.